**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **S.O., by and through her Guardian Ad Litem** | ) | |
| **and next friend, THERESE ROCHE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **15-11789-FDS** |
| | ) | |
| **UNITED STATES of AMERICA and** | ) | |
| **GOOD SAMARITAN MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

_____)

**MEMORANDUM AND ORDER ON**
**MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action for medical malpractice under the Federal Tort Claims Act, 28 U.S.C.

§§ 2671 *et seq.* Plaintiff Therese Roche, guardian *ad litem* and next friend of S.O., a minor,

alleges that negligent medical care during S.O.'s birth caused S.O. to sustain serious and

permanent injuries.

The suit was first filed in Massachusetts Superior Court on July 5, 2012. It named Dr.

David Edinburgh, the physician who delivered S.O., and Good Samaritan Medical Center as

defendants. In November 2014, plaintiff's counsel discovered that Dr. Edinburgh was an

employee of the federally funded Brockton Neighborhood Health Center, and that the claim was

therefore subject to the FTCA.

On May 29, 2015, the Court allowed the substitution of the United States as defendant in

place of Dr. Edinburgh pursuant to 28 U.S.C. § 2679(d). The United States has now moved for

summary judgment on the ground that plaintiff failed to file an administrative claim within two

years as required by the FTCA.  For the reasons described below, that motion will be denied.

I.      **Background**

        A.      **The Birth of S.O. and Her Injury**

        Except where otherwise noted, the following facts are either undisputed or taken in the

light most favorable to the plaintiff.

        Therese Roche is the guardian *ad litem* and next friend of S.O., who is a minor.  S.O. was

born on June 18, 2009, and is the daughter of the late Ana Pires of Malden, Massachusetts.[1]  S.O.

was born at Good Samaritan Medical Center in Brockton, Massachusetts.  She was delivered by

Dr. David Edinburgh.

        The delivery did not go smoothly.  After delivery of the head using forceps, Dr.

Edinburgh diagnosed shoulder dystocia, which is a medical condition occurring during birth

when the baby's shoulder is caught under the mother's pubic bone.  After what Dr. Edinburgh

described as a "successful release of [the] shoulder dystocia," (Edinburgh Consultation Notes,

Dkt. 20-6, at 8), and completion of the delivery, an examination of S.O. in the newborn nursery

revealed that she had sustained an injury to the brachial plexus on her right side.  (Pl. Opp. 4).

        The brachial plexus is a bundle of nerves that runs from the neck to the arm.  (Supp.

Adler Aff. ¶ 4).  The particular type of brachial plexus injury is defined by the severity of the

injury.  When the nerves are pulled, they may stretch, tear, or completely disconnect, depending

on the level of the force applied.  (*Id.* ¶¶ 6-9).  Brachial plexus injuries may resolve with time

and therapy; however, the rate of recovery is inversely proportional to the severity of the injury

sustained.  (*See id.* ¶ 10).  A full recovery may take up to 18 to 24 months, and even then a

---

[1] Pires passed away after this case had been filed in state court.

patient may still demonstrate recognizable weakness and disability.  (*Id.* ¶¶ 13-14).  The

complaint alleges that in attempting to resolve the shoulder dystocia, Dr. Edinburgh applied

excessive traction to S.O.'s head, stretching and tearing her brachial plexus.

On July 3, 2009, approximately two weeks after the birth, Pires visited Brockton

Neighborhood Health Center for a postpartum visit.  She was informed that S.O. would need to

begin physical therapy the following week.  (Def. Rep. Ex. A at 8).  S.O. underwent numerous

medical visits and received physical therapy for treatment of the injury.  At one such visit on

September 8, 2009, neurosurgeon Dr. Liliana Goumnerova of Boston Children's Hospital

explained that "a lot of these will recover on their own with physical therapy and that we will

need to reevaluate her as she gets a little bit older."  (Mone Aff. Ex. A at 5).

As time passed, S.O. showed some, but not complete, improvement.  On December 14,

2009, when she was about six months old, she was examined by Dr. Peter Waters at Boston

Children's Hospital.  (Pl. Supp. Opp. Ex. 11 at 5).  Dr. Waters noted that "[t]his is a situation that

appears to be resolving if it [is] related to brachial plexus."  (*Id.*).  Unfortunately, the situation

did not resolve.  One year later, on December 13, 2010, S.O. was evaluated by Dr. David Hay at

Boston Children's Hospital, who noted that she "continues to show no significant active external

rotation."  (*Id.* at 4).  At a further examination in September 2011, it was noted that although

S.O. "ha[d] shown increased voluntary movement of both hands," she continued to "lack[] any

active external rotation about her shoulder."  (*Id.* at 6).

### B.      The Physician Affidavits

Plaintiff has submitted two affidavits from Daniel Adler, M.D., a board-certified pediatric

neurologist.  The second, or supplemental, affidavit incorporates the first, and therefore only that

affidavit will be addressed.

Dr. Adler described the various forms of injury to the brachial plexus that can occur as a result of shoulder dystocia. Those injuries include neuropraxia (the least severe injury, where the nerve is stretched, and the myelin (the covering of the nerve) is damaged); axonotmesis (where the nerve is stretched to the point that both the myelin and the interior structure of the nerve are affected); and neurotmesis (the most severe injury, where the nerve is ruptured or pulled out of the spinal cord, a process known as avulsion). (Adler Supp. Aff. ¶¶ 6-9). Dr. Adler further stated that S.O. did not suffer a neurotmesis. (*Id*. ¶ 9).

According to Dr. Adler, "[t]he more severe the injury, the less recovery is seen during the first year of life." (*Id*. ¶ 10). "In those instances, very limited recovery, and sometimes no recovery, is apparently [sic] within the first months of life and, in those circumstances nerve surgery is warranted during the first year of life and usually around six months of age." (*Id*. ¶ 11). "The more severe the injury to the brachial plexus, the more substantial the traction that was placed across the brachial plexus." (*Id*. ¶ 12).

Dr. Adler opined, after a review of the medical records, that it was "[his] medical opinion to a reasonable degree of medical certainty [that S.O.'s mother] Ana Pires knew or should have known that her daughter's brachial plexus injury was going to be permanent after the December 14, 2010 clinic visit." (*Id*. ¶ 21).

Plaintiff also submitted a very brief affidavit from Berto Lopez, M.D., who is board-certified in obstetrics and gynecology. According to Dr. Lopez, '[i]n order to have a medical malpractice action alleging negligent care after recognition of shoulder dystocia that results in a brachial plexus injury, the minor child would have to have suffered a permanent brachial plexus injury." (Lopez Aff. ¶ 4).

C.      **Procedural Background**

Plaintiff filed a complaint in this case in state court on July 5, 2012, more than three years

after the birth of S.O.  The complaint named Dr. Edinburgh and the Good Samaritan Medical

Center as defendants.  Dr. Edinburgh answered the complaint on September 10, 2012.  The case

appears to have proceeded in a relatively normal fashion until November 20, 2014, when

plaintiff's counsel was notified that Dr. Edinburgh might be covered under the FTCA.  (Pl. Opp.

7).

On May 6, 2015, the United States removed the case to federal court pursuant to 28

U.S.C. § 1442(a)(1).  On May 18, 2015, the United States Attorney for the District of

Massachusetts issued a certification that Dr. Edinburgh was covered by the FTCA because he

was acting within the scope of his employment at Brockton Neighborhood Health Center when

he delivered S.O. at Good Samaritan Medical Center.  On May 29, 2015, this Court dismissed

the claims against Dr. Edinburgh and substituted the United States as the proper party in his

place. (Dkt. 13).

Thereafter, the United States moved to dismiss the claims against it, contending, in

substance, that plaintiff's claim was untimely because it was not filed within the two-year FTCA

limitations period.  (Dkt. 17).  At oral argument, the parties agreed to convert the motion into a

motion for summary judgment.

II.     **Legal Standard**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when

the moving party shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[ ]

mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that

determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009). When "a properly supported motion for summary judgment is made, the adverse party

'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party

may not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence." *Id*. at 256-57.

### III.    Analysis

As a technical matter, the United States contends that plaintiff's claims against it must be

dismissed for failure to present an administrative claim to the proper agency within the two-year

presentment period as required by 28 U.S.C. § 2401(b). However, under 28 U.S.C. § 2679(d)(5),

if an action in which the United States has been substituted as a party is dismissed for failure to

present an administrative claim, the claim may still be deemed timely if (1) the claim would have

been timely if filed on the date the civil complaint was filed and (2) an administrative claim is

presented to the appropriate agency within 60 days of dismissal.

Plaintiff filed an administrative claim with the United States Department of Health and

Human Services on May 5, 2015, after receiving notice from Dr. Edinburgh's counsel that he

was covered by the FTCA. Thus, the real question to be resolved is whether the complaint was

timely filed in state court.  Plaintiff contends that the complaint was timely filed, but that even if

not, the limitations period should be equitably tolled.  Because the Court concludes that there are

genuine issues of material fact as to whether the complaint was timely under the discovery rule,

it does not reach the issue of whether plaintiff's claim should also be equitably tolled.

### A.       Claim Accrual

The complaint in this case was filed on July 5, 2012.  The alleged medical malpractice

occurred during the birth, on June 18, 2009.  The claim is therefore barred by the FTCA's two-

year limitations period if it accrued before July 5, 2010.  *See* 28 U.S.C. § 2401(b); 28 U.S.C.

§ 2679(d)(5).

Generally, a claim for medical malpractice or other tort accrues "at the time of the

injury."  *Donahue v. United States*, 634 F.3d 615, 623 (1st Cir. 2011).  Under the "discovery

rule," a claim accrues when the plaintiff "knows or reasonably should have known the factual

basis for [the] claim; that is, the existence of [the] injury and its cause."  *Id.*

In medical malpractice cases brought under the FTCA, "the 'discovery rule' may delay

accrual until a plaintiff knows (or reasonably should know) both that he is injured and what

caused his injury; it does not, however, postpone accrual until a potential plaintiff also learns that

his injury was negligently inflicted."  *Sanchez v. United States*, 740 F.3d 47, 52 (1st Cir. 2014).

For accrual to be delayed, "the factual basis for the cause of action must have been inherently

unknowable [that is, not capable of detection through the exercise of reasonable diligence] at the

time of the injury."  *Id.* (quoting *Gonzalez v. United States*, 284 F.3d 281, 288-89 (1st Cir.

2002)).  "Once a plaintiff knows of the injury and its probable cause, he/she bears the

responsibility of inquiring among the medical and legal communities about whether he/she was

wronged and should take legal action." *Id.* (quoting *Gonzalez*, 284 F.3d at 289).[2]

The discovery rule "incorporates an objective standard." *Id*.  It thus charges a plaintiff not only with what she actually knew about her injury, but also with "what a reasonable person, once fairly prompted to investigate, would have discovered by diligent investigation." *Litif v. United States*, 670 F.3d 39, 44 (1st Cir. 2012); *Rakes v. United States*, 442 F.3d 7, 20 (1st Cir. 2006) (court must determine "what such an investigation would likely have revealed.").[3]

Accrual of a medical malpractice claim under the discovery rule is not delayed until the plaintiff learns the full extent of her injury, *Gonzalez*, 284 F.3d at 289, or that the allegedly negligent actor was a government employee, *Skwira v. United States*, 344 F.3d 64, 77 (1st Cir. 2003).

### 1.    Knowledge of Injury

There is no dispute that the fact that S.O. had suffered an injury was apparent immediately after birth.  Plaintiff concedes that an examination in the newborn nursery at Good Samaritan revealed that S.O. "had sustained a brachial plexus injury resulting in minimal motion of [sic] right shoulder and arm." (Pl. Opp. 4).[4]  Plaintiff also appears to concede that a pediatrician spoke to S.O.'s parents concerning the injury and the need for further observation.

---

[2] The *Sanchez* case is illustrative.  That case involved a medical malpractice claim brought after the death of a mother who experienced fatal bleeding in childbirth. *Sanchez*, 740 F.3d at 49.  The injury (death during childbirth) was "sufficiently rare" so as to make the plaintiff "ask why it happened." *Id.* at 52.  The First Circuit had little trouble in determining that the cause of the mother's death (severe bleeding) was both known and documented "contemporaneously" with the death. *Id.*  In addition, the records available to the *Sanchez* plaintiff also documented the relevant specific risk factors that led to the bleeding, and the doctors' actions during the delivery. *Id.* at 52-53.  Thus, by the time of the injury or shortly thereafter, the *Sanchez* plaintiff had available all of the facts necessary to investigate and determine whether a negligence claim was warranted.

[3] Obviously, a newborn infant cannot be charged with conducting an inquiry into the cause of her injury.  Rather, that duty falls upon the actual plaintiff.  Because the complaint was originally brought by S.O.'s mother, Ana Pires, it is her knowledge on which the inquiry is focused.

[4] Certainly, Pires knew of S.O.'s injury no later than her July 3, 2009 post-partum visit to BNHC, where it was noted that S.O. would begin physical therapy the following week. (Def. Rep. Ex. A at 8).

(Supp. Adler Aff. ¶ 14).

### 2.      Knowledge of Cause of Injury

There is no dispute that plaintiff was aware of the identity of the delivering physician, Dr.

Edinburgh.  It is likewise undisputed that Dr. Edinburgh delivered S.O. by a forceps delivery;

that shoulder dystocia was diagnosed after delivery of the head; and that there was a "successful

release of [the] shoulder dystocia."  *See, e.g.*, Edinburgh Consultation Notes, Dkt. 20-6, at 8.

The records also show S.O.'s brachial plexus injury was diagnosed at or immediately subsequent

to her birth.  Although it is not entirely clear, it appears to be undisputed that the application of

excessive force by a delivering physician can be a potential cause, or a contributing cause, of a

brachial plexus injury.

Plaintiff contends that the cause of S.O.'s injury was not the shoulder dystocia itself, but

the allegedly excessive force applied by Dr. Edinburgh (or, alternatively, plaintiff may be

contending that a naturally occurring injury was made worse by Dr. Edinburgh).  The United

States contends that because brachial plexus injuries at birth are rare, a reasonable person would

have attempted to investigate the injury's cause.  The United States further appears to contend

that a reasonable investigation would readily have led to the conclusion that if any tortious act

occurred, it occurred in the course of delivery when Dr. Edinburgh responded to the dystocia.

Under normal circumstances, the government's argument would clearly prevail.

Plaintiff, however, has submitted affidavits from medical experts that state, among other things,

(1) "[i]n order to have a medical malpractice action alleging negligent care after recognition of

shoulder dystocia that results in a brachial plexus injury, the minor child would have to have

suffered a permanent brachial plexus injury," and (2) "[S.O.'s mother] Ana Pires knew or should

have known that her daughter's brachial plexus injury was going to be permanent after the

December 14, 2010 clinic visit." (Lopez Aff. ¶ 4; Adler Supp. Aff. ¶ 21).

The Lopez affidavit is sparse and ambiguous, to say the least, and the chain of reasoning

of the two affidavits is not spelled out. Nonetheless, when read in the light most favorable to the

plaintiff, it appears that the affidavits together can be read to state that (1) an obstetrician

commits medical malpractice in response to shoulder dystocia if he or she supplies sufficient

force to cause a permanent injury, but not if it causes only a temporary injury; (2) it was not

possible to tell that the injury was permanent until December 14, 2010; and therefore (3)

reasonable diligence could not have ascertained that medical malpractice had occurred until

December 14, 2010. Put another way, the affidavits could be read to say that the cause of a

brachial plexus injury is inherently unknowable for some period of time, and cannot be

determined without the benefit of hindsight because the amount of force applied to a baby during

delivery can be deduced only retroactively by observing the rate of recovery, if any, that the

child displays in the first few months and years after birth.[5] That is not the only possible reading

of the affidavits, but it is the one most favorable to the plaintiff.[6]

Thus, plaintiff has put forth expert evidence that the cause of the injury was inherently

unknowable, and that it could not have been known until December 14, 2010, the first date when

plaintiff knew or reasonably could have known that S.O.'s injury was permanent. It follows that

there is a genuine dispute of material fact as to the date of accrual, and that summary judgment

---

[5] Implicit in that argument is an apparent acknowledgement that at least *some* portion of S.O.'s injury was in fact caused by natural forces, not medical malpractice. In other words, plaintiff seems to contend that for the first year or so of life, a temporary (non-actionable) injury is indistinguishable from a permanent (actionable) injury. It would seem to follow that S.O. would have suffered some degree of injury whether or not the alleged malpractice occurred.

[6] Notably, the affidavits do not directly state that the cause of the injury was inherently unknowable. Furthermore, Dr. Lopez's use of the phrase "have a medical malpractice action" is capable of a variety of different interpretations; among other things, it could easily be read to say that the fact of Dr. Edinburgh's *negligence*, rather than the *probable cause* of S.O.'s injury, could not be discovered until December 2010.

10

on the basis of the statute of limitations should be denied.

To be clear, the Court is not deciding that the claim was in fact inherently unknowable, or that the complaint was indeed timely filed.[7]  It may well prove to be true, for example, that reasonable diligence would have in fact uncovered the probable cause of the injury as soon as the injury was apparent.[8]   But the Court, based on the record before it, can neither rule definitively that the claim accrued at birth (on June 18, 2009), at the time the injuries were determined to be permanent (according to plaintiffs, on December 14, 2010), or at some other time.  The date of accrual is a disputed fact that will have to be resolved at trial.

In summary, viewing the record in the light most favorable to the plaintiff, the Court concludes that there are genuine issues of material fact as to the probable cause of S.O.'s injury and whether a reasonably diligent plaintiff would have discovered that probable cause prior to July 5, 2010.  Therefore, defendant's motion for summary judgment on the issue of whether plaintiff's claim was timely filed will be denied.

### B.     Equitable Tolling

Plaintiff contends that even if her claim accrued more than two years before she filed suit, the FTCA's two-year limitations period should be equitably tolled.  Because it is not necessary to reach that issue, the Court does not decide it.

---

[7] Of course, the question before the Court is not the actual cause of S.O.'s injury—that is, whether it was the shoulder dystocia, the force applied by Dr. Edinburgh, or some other cause.

[8]  A claim does not accrue the moment a plaintiff knows (or reasonably should know) of a *possible* cause of her injury, but when she knows of its *probable* cause.  *United States v. Kubrick*, 444 U.S. 111, 188 (1979) (claim accrued when plaintiff "was aware of his injury and its probable cause."); *Sanchez*, 740 F.3d at 52 (quoting *Gonzalez*, 284 F.3d at 289 ("Once a plaintiff knows of the injury and its probable cause, [she] bears the responsibility of inquiring among the medical and legal communities about whether [she] was wronged.")); *Skwira*, 344 F.3d at 76-77 (a reasonably diligent plaintiff who knows of "injury and its probable medical cause" can then discover whether there was negligence involved).  Allowing the limitations period to begin running simply on knowledge of a possible cause would effectively make the "cause" element of the discovery rule superfluous in the medical malpractice context, because negligence is likely always a "possible" cause of any injury that follows a medical procedure.

11

**IV.**     <u>**Conclusion**</u>

      Taking the record evidence in the light most favorable to the plaintiff, there exists a genuine issue of material fact as to whether the cause of action accrued before July 5, 2010, two years prior to filing the complaint, and therefore the Court cannot conclude as a matter of law that the claim is barred by the statute of limitations.  Defendant's motion for summary judgment is accordingly DENIED.

**So Ordered.**


                                   /s/  F. Dennis Saylor
                                   F. Dennis Saylor IV
Dated:  February 11, 2016              United States District Judge